## STATUTORY LIABILITY UNDER A SURRENDERED STOCK CERTIFICATE.

Common Pleas Court of Cuyahoga County.

THE STATE BANKING & TRUST COMPANY v. THE MATTIE MITCHELL COMPANY ET AL.

Decided, January 28, 1913.

*Corporations—Liability of Stockholders of an Insolvent Company—Effect of a Transfer which Was Never Entered on the Stock Ledger—Purchase by a Company of its Own Stock Not Ultra Vires, When—Section 3258, R. S., Establishes a New Rule of Evidence as to the Ownership of Stock—Sections 3254, 3258 and 3259, R. S.*

Officers of the defendant company, while entirely solvent, received back the stock of a dissatisfied holder and returned to him the amount he had paid for it, and this action was subsequently ratified by the directors and by each and all of the stockholders. The certificate was released and surrendered by a writing on the back thereof, properly signed and witnessed, and was delivered by the holder to the secretary of the company with the request that the surrender be properly entered on the books of the company, but instead of so doing the secretary placed the certificate in an envelope marked "Treasury Stock issued to S." The transfer was never entered on the stock ledger or any similar book, and the stub in the stock ledger continued to show that the certificate had been issued to S. Two years later the company became bankrupt, and the envelope containing this certificate came into the hands of the receiver, the present action to enforce stockholder's liability following. There was no evidence or claim that any creditor made any investigation as to who were stockholders before giving credit to the company, although this information was available to all who were receiving credit. *Held:*

1. Under the rule of evidence as established by Section 3258, R. S., as amended after the surrender of this stock but before the accumulation of an indebtedness, S was not a stockholder during the period when the debts of the company were incurred. *Harpold v. Stobart, 46 O. S., 397, criticised and not followed.*

2. A corporation does not act *ultra vires* in the purchase of its own stock, where no question arises as to the good faith of the parties, and the transaction has been fully executed, and the company at the time was free from debt, and the purchase was made to avoid

loss to the company through the resistance of the dissatisfied holder against the securing of loans for the purpose of enlarging the business, and the transaction has passed unquestioned for a long period; and a stockholder so surrendering his stock is not subject to a continuing statutory liability.

*Smith, Taft & Arter,* for plaintiff.

*E. K. Wilcox,* contra.

COLLISTER, J.

The above entitled action was brought to subject divers defendants, claimed to be stockholders of the Mattie Mitchell Company, to the payment of the statutory liability, so-called. The case was referred to a referee, and on October 14, 1912, he filed his report in this court. The matter is now before the court on a motion to confirm the report by the plaintiff, and on exceptions to the report by the defendant, George A. Stanley.

The question was tried before the referee on an agreed statement of facts. A decision by this court means a review of the conclusions of law as found by the referee from such agreed statement of facts. The facts of said agreed statement, so far as I deem them essential to the questions at bar, are as follows:

The said the Mattie Mitchell Company had an authorized capital stock of $50,000, divided into 500 shares of $100 each; that H. E. Williams was president, director and general manager of said company, and C. T. Denley was its secretary, during all the times involved in said action; that prior to April 10, 1901, the Mattie Mitchell Company was engaged in the manufacture and sale of a certain food product known as "The Mattie Mitchell Self-Rising Flour"; that said food product was a new and untried variety, for which there was little or no market or demand; that on April 5, 1901, said company increased its capital stock from $30,000 to $50,000 aforesaid; *and on said date said company, by its board of directors, authorized, empowered and directed its president and secretary to sell said 200 shares of said increased capital stock, for the purpose of providing money for advertising and creating a demand for said food products;* and, pursuant thereto, said company, *through its said president and secretary, proposed and offered to issue*

*to the defendant, George A. Stanley,* 30 shares of its capital stock, at the par value of $100 per share; and on the 10th day of April, 1901, said company issued and delivered to said George A. Stanley 30 shares of its capital stock, for which he paid to said company the sum of $3,000; that the following is a true copy of stub No. 3 of the stock certificate book of said company, said stub No. 3 being the one from which the certificate for said 30 shares was detached and issued to said George A. Stanley, to-wit:

"Certificate No. 3 for thirty (30) shares issued to George A. Stanley, dated April 11, 1901, from whom transferred, dated 190, No. original, No. original, No. of shares. Certificate shares transferred. Received certificate No. 3 for thirty (30) shares, this 10th day of April, 1901. George A. Stanley."

That the certificate for said thirty shares was in fact issued to said George A. Stanley on April 11, 1901, and the entries on said stub No. 3 were in fact made on or prior to April 11, 1901, and the receipt therein contained was signed by said George A. Stanley on April 11, 1901, and the certificate for said thirty shares was in fact received by said George A. Stanley on April 11, 1901; that said company kept no "stock ledger" or book in which was recorded the issue or transfer of stock certificates, other than the "stock certificate book" from which the certificate aforesaid was detached, and of which said stub remained a part.

Said agreed statement of facts contains the following as a part thereof:

"It is further agreed that George A. Stanley and H. E. Williams would testify as follows, and said statements are admitted and received in evidence subject only to the objection by plaintiff that the statements and representations made by the officers of the company are not binding upon the company, and are without legal effect as against the plaintiff and other creditors of said the Mattie Mitchell Company." [Such objection was not urged, or even suggested, on the hearing on the above motions; so it is fair to say it has been abandoned.]

"That on and prior to April 10, 1901, and for the purpose of raising money for advertising and creating a demand for the self-rising flour, to be manufactured by said company, the directors of the Mattie Mitchell Company had resolved to issue

and sell a portion of its authorized but unissued stock, *and for the purpose of inducing said George A. Stanley and Jessie McMath Stanley, a defendant, to purchase said stock, the president and secretary of said company represented to said George A. Stanley and said Jessie McMath Stanley that said company could and would obtain the entire amount of money required for said purpose from the sale of its unissued capital stock. That inasmuch as said business was largely experimental in character, said company would conduct its business entirely with and within its paid-in capital, and it would not enlarge or increase its expenditures or obligations beyond its said capital, and that in no event would said company obtain credit or borrow money for the purpose of carrying on its business, or for advertising and creating a demand for its product.* That on April 10, 1901, said George A. Stanley and Jessie McMath Stanley agreed to purchase 50 shares of said stock (George A. Stanley to purchase 30 of said shares and Jessie McMath Stanley 20 thereof), and that in so doing they each relied upon the representations and promises made to them as aforesaid, *and would not have purchased said stock if said representations and promises had not been made to them;* that thereupon, on the 11th day of April, 1901, said company issued and delivered to said George A. Stanley 30 shares of its said capital stock, and 20 shares thereof to Jessie McMath Stanley, for which they paid to said company the sum of $5,000. That afterward, *and at the time when said company had expended a large amount of money in advertising, and had exhausted its means for further conducting its business,* said company, by its officers and directors, determined and attempted to borrow a large sum of money, to be expended in further advertising said food product, and paying the expenses of carrying on the business, all of which was in violation of the representations and promises made to the defendants, George A. Stanley and Jessie McMath Stanley, as above set forth. *Thereupon said defendants, George A. Stanley and Jessie McMath Stanley, objected and protested to the stockholders and directors, and to the bank from which said loan was to be obtained; and, further protesting, said defendants, George A. Stanley and Jessie McMath Stanley, notified said bank not to make said loan, and notified the officers of said company that if they persisted in their efforts to obtain said loan, said defendants, George A. Stanley and Jessie McMath Stanley, would apply to the court for the appointment of a receiver for said company, and for an injunction restraining it and its officers from making or obtaining said loan. Thereupon, and for the purpose of avoiding loss to said company and adjusting said controversy whereby it might*

*be able to continue its business,* said company, by its officers and directors, then and there agreed to receive back its said shares of stock and return to said defendants, George A. Stanley and Jessie McMath Stanley, the amounts of money they had paid therefor, without use or diminution thereof, and regardless of the resudlt of the business while said stock had been held by those defendants; and pursuant to said agreement, on the 29th day of August, 1901, said George A. Stanley, in good faith, released and surrendered said 30 shares of stock to the company *by a writing on the back of the certificate representing said stock, properly signed and witnessed,* and delivered the same to the secretary of the company, and requested that said release and surrender be properly entered on the books of the company.''

It is further agreed in said statement of facts that the action of the officers of said company, in receiving said stock and paying said money to said Stanleys, was afterwards unanimously approved, ratified and adopted by the board of directors, and by each and all of the stockholders of said company.

It is further agreed that the following record appears on the record book of said company:

''Directors' meeting. Cleveland, Ohio, March 18, 1902. There was held this day, at the office of the company, a meeting of the board of directors, there being present Messrs. H. E. Williams, A. C. Moss, M. M. Williams and C. T. Denley.

''The president called the meeting to order at 1 o'clock.

''Minutes of the last meeting were read and approved.

''The secretary read a letter from Mr. George A. Stanley tendering his resignation as a director of the company. Mr. Moss moved it be accepted, and the motion was seconded by Mrs. Williams, and was duly carried.

''Mr. Moss moved that Mrs. Denley be elected a director of the company, to fill the vacancy caused by Mr. Stanley, and the motion being seconded by Mrs. Williams, carried.

''Mr. Moss then offered the following preamble and resolution:

''WHEREAS, Mr. George A. Stanley did on August 27, 1901, not only decline to assist the company in borrowing money to carry on their business, but did further announce to the officers of the company that he would oppose in every way in his power the borrowing of any money whatever by the company, even to the extent of carrying the company into court if necessary, for the purpose of preventing its borrowing money, and otherwise announced that he was utterly opposed to the views and

plans of the officers of the company, in the prosecution of its business, and that he is and would be a stumbling block in their way, and that it was his opinion that they had better buy him out, giving them notice that if they did not buy his stock at once, he would peddle it on the street; upon consultation, the officers of the company decided that it was desirable and necessary to at once buy the stock standing in the name of George A. Stanley and Jessie McMath Stanley, which purchase they made within a very few days thereafter; now, therefore, be it

" '*Resolved*, That the action of the officers of the company in so purchasing the stock standing in the names of George A. Stanley and Jessie McMath Stanley, and their further action in making a promissory note of the company for the purpose of borrowing money to pay for said stock, be, and is hereby, approved and authorized by the board of directors of the Mattie Mitchell Company, and that said preamble be further spread on the minutes of the meeting.'

"Motion was seconded by Mr. Williams, and vote being taken, the following directors voted 'aye': H. E. Williams, M. M. Williams, A. E. Moss and C. T. Denley. There being no negative vote, the resolution was unanimously carried.

"The above preamble and resolution having been submitted to Mrs. L. F. Denley, she, as a director and stockholder of the company, approved the same.

"Mr. Denley moved that the president and treasurer of the company be authorized to make a loan, at bank or otherwise, for a sum not to exceed $15,000; and to execute a promissory note or notes of the company for said purpose, upon such terms as they may be able to effect, for the prosecution of its current seasons business.

"There being no further business, the meeting adjourned.
"C. T. DENLEY, *Secretary.*"

It was also agreed in said agreed statement of facts that when the books and papers of said company came into the hands of the receiver (the record of this court shows that a receiver was appointed on the ........ day of ..............., 190..), among other papers was an envelope on the outside of which was written, "Treasury stock of the Mattie Mitchell Company, formerly issued to George A. Stanley and Jessie McMath Stanley," and which envelope contained the two certificates referred to above. That on February 27, 1904, an involuntary petition in bankruptcy was filed against the Mattie Mitchell Company, and said company was afterwards duly adjudged a bankrupt,

and said bankrupt estate has been duly administered and settled. That the trustee in bankruptcy took possession of all the property and assets of said company, and that said assets and property were insufficient for the payment of the secured debts of said company, there was nothing to pay a dividend to the general creditors and no dividend was paid to them, and that there were no funds with said trustee to be applied on the indebtedness of the company, and said company has ceased to do business, and has no property.

It is further admitted in said agreed statement of facts that on August 29, 1901, said company was entirely solvent, and that each and all of the claims and debts represented in this proceeding were incurred and created at times long subsequent thereto.

It is further agreed that all the stockholders of said company, except George A. Stanley and Jessie McMath Stanley (and Lavina Denley, who had owned one share, but had duly and legally transferred it to C. T. Denley, an insolvent person), were and are insolvent, and no money can be had from any of them.

It is further admitted that there are debts of the company incurred and created long subsequent to August 29, 1901, and sufficient in amount so that if George A. Stanley is held to be a stockholder, the amount of the statutory liability thereon should be collected and applied to the payment thereof.

There is a schedule of claims attached to the agreed statement of facts, which schedule it is agreed is correct, and which shows that none of the indebtedness was incurred prior to August 29, 1901, or prior to March 12, 1902, the date of the meeting of the directors above quoted.

The plaintiff claims George A. Stanley should be held to be a stockholder,

(1). Because the transfer by him was never entered upon a stock ledger or similar book, and the stub of the certificate book showed the stock was issued to him, and there is no further entry in any book of the company in reference to said stock;

(2). Because the act of the company in acquiring his stock was *ultra vires* of the company, and therefore void; and George

A. Stanley, by reason thereof, continued to be and was in law thereafter a stockholder.

The defendant claims he was not a stockholder after August 29, 1901, because

(1). The stock was released and surrendered to the company by "a writing on the back of the certificate representing the stock, properly signed and witnessed"; and

(2). The acquiring of the stock by the company was not *ultra vires* of the company; and

(3). That the circumstances and facts that induced the surrender of the stock by said Stanley on August 29, 1901, and the acquiring of it by the company, were such as to take the transaction out of the general rule, if there be such a rule in Ohio, forbidding a company to buy its own stock, and was therefore valid, and said Stanley ceased to be a stockholder from said date.

There is another question in the case, to-wit, if the court finds said Stanley to be a stockholder, from what time should interest be computed on his liability?

We will try to take up these questions in the above order.

Section 3, Article XIII of the Constitution of the state of Ohio, 1852, reads as follows:

"Dues from corporations shall be secured by such individual liability of stockholders and other means as may be prescribed by law; but in all cases each stockholder shall be liable, over and above the stock by him or her owned and any amount unpaid thereon, to a further sum at least equal in amount to said stock."

For a long time prior to April 10, 1901, Section 3258 of the Revised Statutes of Ohio read as follows:

"Sec. 3258. The stockholders of a corporation which may be hereafter formed, and such stockholders as are now liable under former statutes, shall be deemed and held liable, in addition to their stock, in an amount equal to the stock by them subscribed, or otherwise acquired, to the creditors of the corporation, to secure the payment of the debts and liabilities of the corporation. (52 v. 44, Section 78, S. & C. 310.)"

Section 3259 of the Revised Statutes of Ohio reads as follows:

"The term 'stockholders,' as used in the preceding section, shall apply not only to such persons as appear by the books of the corporation to be such, but to any equitable owner of stock, although the stock appears on the books in the name of another."

In 1889 the Supreme Court, in *Harpold* v. *Stobart*, 46 O. S., 397, says in the syllabus:

"Where, in such case, the vendor causes an entry of transfer to be made by the secretary of the company, in a book then present at the company's office other than the stock book, with the expectation that it will be entered in another book then at the residence of the secretary, but no transfer is made in the stock book of the company, and, at the time of the accruing of the debts of the corporation, and at the time of the trial, such vendor appears, by the stock book, to be the owner of the shares, such entry of transfer is not sufficient to relieve the vendor of liability to the creditors of the corporation, notwithstanding the fact that the sale was made in good faith and for value, and that the vendor believed he had done all that was necessary to effect a transfer of the stock, and the further fact that the company thereafter treated the purchaser as the owner of the stock so sold."

In the opinion, the court cites Section 3259, *supra,* as the authority for the decision.

While I am aware that a nisi prius court should be loath to question a decision of the Supreme Court, yet the nisi prius court must not let a Supreme Court decision, especially where such decision does not make a rule of property, become so overshadowing as to blind his reason. With all due deference to the court deciding the case of *Harpold* v. *Stobart,* I am of the opinion that such court misinterpreted said Section 3259. That statute must be construed in connection with Section 3254 of the Revised Statutes, which reads as follows:

"Sec. 3254. Stockholders shall be entitled to receive certificates of their paid-up stock in the company; and the president and secretary of the company shall, on demand, execute and deliver to a stockholder a certificate showing the true amount of stock held by him in the company; and it shall be the duty of the directors of said corporation, when organized, to keep a record of stock subscribed and transferred, and of the secretary or recording officer of such corporation to register therein the

subscriptions and transfers of stock. For that purpose a book shall be kept; and whenever any certificate or certificates of stock are assigned and delivered by a stockholder, the assignee thereof shall be entitled, on demand, to have the same duly transferred upon said book by such secretary or recording officer, whose duty it shall be at the same time to enroll therein also the name of such assignee as a stockholder; and the books and records of such corporation at all reasonable times shall be open to the inspection of every stockholder.''

When Section 3259 is read in such connection, it must be clear that the ''book'' therein mentioned was the ''book'' provided for in Section 3254, and the purpose of the section was to hold the *actual* stockholder, though the stock *actually owned* by him appear in such book in the name of another, and was not enacted for any other purpose; surely not for the purpose of making one a stockholder who was not in fact a stockholder.

This view of said decision I find strengthened when I read the case of *Herrick* v. *Wardwell et al,* 58 O. S., 294, in the opinion of which, on page 311, the court, in passing on this same question, cites said Section 3254 as a statutory authority in holding the same way as did the court in the Harpold case, and decides the question without citing said Harpold case as an authority therefor.

In 1898, while said Sections 3254, 3258 and 3259 were as above quoted, the Supreme Court decided the Herrick case, *supra.* Paragraph 3 of the syllabus of that case reads as follows:

''The stockholders of a corporation whose names appear on the stock book, or in the absence of such book, on stubs of stock certificates, as holders of stock are subject to a stockholder's liability for debts incurred by the corporation while such names are allowed to so remain. To avoid such liability, it must appear on the stock book in the one case, or on the stub of the stock certificate in the other that the stock had been transferred to some one else.''

So much of the facts of that case as would make the opinion intelligible are as follows:

''The Cleveland Dairy & Transportation Company was organized and incorporated under the statutes of this state, as a corporation for profit, in December, 1891, with a capital stock of

twenty thousand dollars, the shares of stock being fifty dollars each. The defendants in error, J. W. Wardwell, L. G. Kies and W. W. Whitacre, became stockholders when the company was organized, J. W. Wardwell subscribed and paid for seventy shares of stock, and received a stock certificate therefor, and the stub of the certificate showed that he held the seventy shares of stock. In like manner Mr. Kies and Mr. Whitacre subscribed and paid for five shares of the stock each, and received like certificates, the stubs showing the number of shares held by each. The remainder of the stock subscribed for by others was evidenced by like certificates and stubs, but no stock book, other than the stubs and stock subscriptions, was kept by the company.

"During the months of February and March, 1892, the company made a large unmber of contracts with the milk producers located within convenient distance of Cleveland, where the company had its place of business. The contracts were upon printed forms prepared by the company, and differed only in dates, amounts, and names, etc. The following is a copy of the contract entered into with P. B. Nichols, and the others are in legal effect the same:     *     *     *

"On the 22d day of August, 1892, said J. W. Wardwell sold, assigned and transferred his seventy shares of stock to his son, and a certificate was issued to the son for the stock, and the stub of the certificate to the son showed that the stock came from his his father, but the stub of the certificate issued to the father did not show that the stock had been transferred to the son. On the 30th day of August, 1892, Mr. Kies and Mr. Whitacre sold, assigned and transferred their stock to one D. W. Holbrook, and certificates of stock were issued to him, and the stubs were the same as in the case of Mr. Wardwell.

"On the 15th day of December, 1892, the company made an assignment for the benefit of its creditors, and thereafter this action was commenced by Newton Herrick, a creditor, in behalf of himself and all the creditors of the company, against the stockholders of the company, including said J. W. Wardwell, W. W. Whitacre and L. G. Kies, seeking to collect the statutory liability, for the benefit of all the creditors of the company.

"Wardwell, Whitacre and Kies answered setting up the sale and transfer of their stock at the dates above mentioned.

"Deliveries of milk continued under said contracts until the date of the assignment on the 15th of December, 1892, and at that time the company owed about $13,000 for milk delivered during the months of November and December, 1892. The milk delivered before the transfer of the stock by Mr. Wardwell, Mr. Whitacre and Mr. Kies, was all paid for before the assignment.

"The assignees of the Wardwell, Whitacre and Kies stocks

conceded their liability, but as they were insolvent, and as nearly all of the other stockholders proved insolvent, it required the full amount of the statutory liability of all the solvent stockholders, including Wardwell, Whitacre and Kies, to pay the debts and costs of suit, and therefore the creditors insisted that they had the right to collect double liability from all who were stockholders at the time the milk contracts were entered into with the company.

"A referee was appointed in the court of common pleas. Upon appeal the case was heard in the circut court, the parties agreeing as to who the creditors were, and the amount due to each. The circuit court in its judgment found the names of all the creditors, and the amount due to each as agreed upon, and found the amount due from each stockholder and rendered judgment therefor against such stockholder, and appointed a receiver, and ordered that the amounts for which judgment was rendered against the several stockholders, should be paid to the receiver, and that he should pay the costs and fees out of the fund, and distribute the balance *pro rata* among the creditors. The circuit court held that the stockholders who had transferred their stock were liable only for the milk delivered under the contracts before the assignments of stocks were made, and there being some debts due from the company before the transfer of said stocks, the circuit court rendered judgment against J. W. Wardwell for $347, against W. W. Whitacre for $21.85, and against L. G. Kies for $21.85, as the amount to be contributed by each toward the payment of said debts so due before said transfer of their respective stocks; but the circuit court refused to render judgment against said Wardwell, Whitacre and Kies, to increase the fund to be applied to the payment of the debts for milk delivered after the transfer of their said stocks.

"The plaintiff below, plaintiff in error here, in behalf of himself and the creditors of the company, excepted to the finding and judgment of the circuit court, so far as concerned the liability of said Wardwell, Whitacre and Kies; and also in behalf of himself and said creditors, filed a motion for a new trial, which was overruled, to which said plaintiff in behalf of himself and said creditors excepted.

"Thereupon the plaintiff in error, for himself and all the creditors of said company, filed his petition in error in this court, seeking to reverse and modify the judgment of the circuit court so rendered against said Wardwell, Whitacre and Kies, claiming that said judgment is too small."

After deciding some other matters, the Supreme Court, in its opinion, says (beginning on page 308):

"Next it is urged by defendants in error that the debts for milk delivered under the contracts, accrued, not at the date of the execution of contracts but at the time of the delivery of the milk.

"The language of the Constitution, Article XIII, Section 3, is as follows:"   (The same as hereinbefore quoted.)

"Section 3258 of the Revised Statutes of Ohio reads as follows:"   (The same as hereinbefore quoted.)

"Stockholders are liable to secure the payment of the 'dues' from corporations, as well as the 'debts and liabilities' thereof. The liabilities mentioned in the statute are to the 'creditors' of the corporation, but in the Constitution 'creditors' are not named.   The word 'creditor' can not have the effect to limit or narrow the words 'dues, debts and liabilities.'   Whoever has a claim against a corporation which falls within the terms 'dues, debts and liabilities' is a creditor of such corporation within the meaning of the Constitution and statute under consideration.

"When the corporation executed these milk contracts, it thereby incurred a liability to pay for all the milk which should be shipped under said contracts.   Whether an end could have been put to this liability by the corporation before the expiration of the time limited in such contracts, we need not now inquire.   It is enough to say that no attempt was made to avoid the contracts, and that the shipment of milk continued under the contracts until the corporation made an assignment.   The liability of the contracts for the debts arising from the delivery of milk thereunder, therefore, accrued at the time of the signing of the contracts, and under the authority of *Brown* v. *Hitchcock*, 36 O. S., 667, the defendants in error remained liable on their stock for the milk shipped after they assigned their stock to insolvent persons."

The court, though it found the defendants liable for the reasons just stated in its opinion, proceeds further and holds the defendants liable for a further reason.   It is found in the following language in the opinion, beginning on page 310:

"But the defendants in error are liable also upon another ground, even though it be conceded that the debts or liabilities for milk did not accrue until the delivery of the milk.   It is conceded that they were stockholders when the milk contracts were made, and they continued to hold their stock until late in August, 1892; that no stock book showing transfers was kept, that the only record kept of the issuing of stock was the entry on the stubs left after removing the stock certificates, and that while the stubs of the new certificates issued to the purchasers

of this stock showed from whom the stock was received, the stubs of the certificates issued to the defendants in error did not show that said stock had been sold or transferred.

"As there was no regular stock book showing transfers kept by the company, the stock certificate book and stubs were made to take its place, and upon these stubs and upon the stock subscription book the names of these defendants in error stood as stockholders; and it is well settled that all whose names so stand upon the stock book are liable as stockholders to those dealing with the corporation, until the stock book shows that such stock has been transferred, or disposed of in some other way.

"It is urged in behalf of defendants in error that as the stubs of the stock issued to the purchasers thereof showed that the stock was received from the defendants in error, such stubs were notice to the world that such defendants were no longer stockholders, even though the stubs of the original issue of the stock to them still showed defendants in error to be stockholders, and nothing appeared on those stubs to show a transfer of their stock. This claim is not sound.

"By Section 3254, Revised Statutes, it is provided that a book shall be kept by the corporation for the purpose of registering therein all subscriptions and transfers of stock, and it is made the duty of the directors to keep such record, and of the secretary to register in such book all subscriptions and transfers of stock; and it is further provided that whenever any certificates of stock are assigned and delivered by a stockholder, the assignee thereof shall be entitled to have the stock transferred to him upon the books and to have his name enrolled as a stockholder.

"It is not the assignment and delivery of the certificate of stock that relieves the stockholder from liability for the debts of the corporation, under this section, but the transfer of the stock on the books; because after such transfer the old stockholder no longer stands as a stockholder on the books of the company. The stock book is notice to the world as to who are stockholders of the corporation, and the statute has provided how the book and transfers shall be kept, and this provision is for the protection of the public, and to inform stockholders as to their liability, and how and when an end may be put to such liability.

"If this corporation had kept a stock book showing transfers, and these defendants in error had caused their stock to be transferred on such book, they could not be held liable for debts thereafter incurred. Instead of obeying the statute in this regard, they resorted to the practice of keeping the stock account and transfers on the stubs, supposing that to be as good as a regular stock book. In this they were mistaken. A stock book would have shown the subscription and transfer in the same

account, but the stubs of the old certificates showed only that the stock had been issued, and failed to show that it had been transferred. True, the stub of the new certificate showed from whom the stock came, but the stub of the old certificate failed to show where the stock had gone, or that it had been transferred at all. The whole stub book taken together might have shown the transfer of this stock, but the public can not be put off with less than the statute gives them.

"The statute having prescribed the manner of keeping the record of the subscription and transfer of stock, a different method will not be upheld, unless it is shown to be equally as good and convenient as the one provided by statute. Stockholders can not escape liability by pursuing a course different from that provided by statute, and which imposes additional burdens upon the public, or makes it more difficult to ascertain who the stockholders are. The public has a right to rely upon the statute, and are entitled to its provisions, or its full equivalent.

"It follows that the circuit court erred in not rendering judgment against the defendants in error for an amount equal to the amount of their stock. The judgment of the circuit court will be modified by rendering judgment against the defendants in error for the remainder of their liability."

Said Section 3254, by itself, or as construed by the court in the Herrick case, can not, in my opinion, be held to mean that the Legislature has made or meant to make a person liable as a stockholder in a corporation when in fact he is not and was not such stockholder. Such a construction would make the statute repugnant to both the federal and the state constitutions. But the Legislature, as has often been decided, can make a rule of evidence, and I think that is what the court intended to decide in the Herrick case; that is, by the rule of evidence established by the section of the statute quoted, Wardwell and others were held to be stockholders.

On April 29, 1902, said Section 3258 was amended so as to read as follows:

"The stockholders of a corporation who are the holders of its shares at a time when its debts and liabilities are enforceable against them, shall be deemed and held liable equally and ratably, and not one for another, in addition to their stock, in an amount equal to the stock by them so held, to the creditors of the corporation, to secure the payment of such debts and liabil-

ities; and no such stockholder who shall transfer stock in good faith, and such transfer is made on the books of the company, *or on the back of the certificate, properly witnessed,* or tendered for transfer on the books of the company, prior to the time when such debts and liabilities are so enforceable, shall be held to pay any portion thereof.   (52 v. 44, Section 78, S. & C. 310, R. S. of 1880, 95 v. 312.)''

The Herrick case was decided on April 19, 1898.   The said section of the statute was amended as above on April 29, 1902, evidently because of the decision in the Herrick case and to escape from its consequences.   In my opinion it established a new rule of evidence as to ownership of stock, and in that view it is constitutional.   By it, stock may be transferred, if done in good faith, by delivering the certificate, with the transfer on the back thereof properly witnessed and signed; and when thus transferred, such transfer is evidence that the person so transferring it is no longer a stockholder.

The testimony of George A. Stanley and H. E. Williams is, that ''on August 29, 1901, said George A. Stanley, in good faith, released and surrendered said thirty shares of stock to the company, by a writing on the back of the certificate representing said stock, properly signed and witnessed.''   True, the statute was not amended as above quoted until April, 1902.   It is also true that none of the debts, for the payment of which it is now attempted to hold said George A. Stanley, was incurred or created until after both said dates.   The certificates so signed and witnessed were delivered to the company on August 29, 1901, and were in the possession of the company from that time until the books and papers of the company came into the hands of the receiver.   This is made reasonably certain from the agreed statement of facts, which contains this statement: ''That at the time the books and papers of said company came into the hands of the receiver, and among said papers was an envelope on the outside of which was written 'Treasury stock of the Mattie Mitchell Company formerly issued to George A. Stanley and Jessie McMath Stanley,' and which envelope contained the two certificates referred to above, and has ever since been in the hands of the receiver.''   So, such evidence of ownership was

created on August 29, 1901, and remained in existence and in possession of the company until long after this action was commenced, and was so in existence and in such possession when said statute was amended as aforesaid, and when the said debts were incurred and created, and was available to any person from whom the company was seeking credit; and any prospective creditor, if he had searched for evidence on that subject, in the papers, books and documents of the company, would have found it.

There is absolutely no evidence or claim in the case that any creditor made any investigation before giving credit to the company, as to who were the stockholders in fact, or in the view of the law as stated in the Herrick case, that any creditor claimed that said George A. Stanley was, or that he, the creditor, thought he, Stanley, was in fact a stockholder; or that such creditor had made any examination at all concerning what the books or stubs of the company showed on the subject.

It follows that, so far as this feature of the case is concerned, I find against the contention of the plaintiff.

The defendant claims a corporation, in purchasing its own stock, is not acting *ultra vires* of the corporation, and cites three cases in support thereof. The first case cited is that of *Taylor* v. *The Miami Exporting Company et al*, reported in the 6 Ohio, page 177, decided by the Supreme Court in 1833. The court in that case sanctioned the acquiring by the corporation of shares of its own stock when done in good faith, but it seems to me the court based its opinion on the wording of the charter of the company. That company was created while the Constitution of 1802 governed, and which Constitution did not expressly provide for or prohibit the formation of corporations. The practice under it was for the Legislature to create corporations by special act, which act was the charter of the company.

I conclude the court decided as it did in the Taylor case because the charter authorized it. This conclusion, I think, is borne out by the following quoted language from the opinion on page 219, to-wit:

"As to the authority of the directors to receive the stock of the company in payment of the debts of the stockholders. This company was incorporated on April 15, 1803, its charter to con-

tinue until May 1, 1843. The ostensible object of those who obtained the charter, was to purchase the agricultural and manufactured products of the country, and to transport them to foreign markets; hence the name, 'Miami Exporting Company.' Section 6 of the charter authorizes the appointment of agents and the making of shipments. By Section 8, the company is required to vest in produce and manufactures at least one-half of the cash received on shipments. Their real object was banking; and the directors were, by the charter, designedly given most extensive powers over the funds of the company, so as to authorize them to employ the whole in business other than that apparently as the sole object of the incorporation. By Section 5 of the charter, it is provided that the president and directors shall open and continue their office in the town of Cincinnati, "and shall have the *sole management of the funds.*' By Section 6, the president and directors are authorized 'to dispose of the funds of the company in such manner as they shall think most advantageous to the company.' The directors are here undoubtedly authorized to cease merchandising, and to dispose of the funds of the company in banking, in discounting notes and bills of exchange, if they think it 'most advantageous.' They are as undoubtedly authorized to dispose of their funds, and to employ their agents in buying and selling the stocks of other corporations, if they think this 'most advantageous.' It appears from the testimony in the case, that they were at one time largely and profitably employed in buying and selling the stock of the Bank of the United States. If they could so vest their funds, why have they not power to buy and sell their own stock, if they 'think it most advantageous to the company.' We think they have such power,'' etc.

If my understanding of that case is the correct one, it can not be taken as an authority in favor of defendant's contention.

In 1856 the United States Circuit Court for the Northern District of New York decided the case of *The State Bank of Ohio* v. *Fox,* reported in 3 Blatchford, page 431. In the opinion the court, on page 433, says:

''3. It is insisted that the facts set up and proved by the defendants constitute a defense to the note. It appears by the bill of exceptions that the Columbus Insurance Company, to whom the note was given, had taken a considerable portion of their stock in payment of debts due to it. This they had a clear right to do. *Taylor* v. *Miami Exporting Company,* 6 Ohio, 218.''

This case does not decide that corporations can buy their own stock. It decides nothing further than that a corporation can take its own stock in payment of debts due to it. In other words, it recognizes that, under at least one set of circumstances, a corporation can acquire its own stock.

In 1858 the Court of Appeals of the State of New York decided the case of *The State Bank of Columbus* v. *Bruce and Fox,* reported in 17 N. Y., page 507. The question decided was precisely the same as in the 3 Blatchford case, *supra,* and the case was practically between the same parties and upon similar facts. The first paragraph of the syllabus reads:

"In the absence of prohibition by statute, a corporation may purchase its own stock, hold it unextinguished, and reissue the same."

The court, in the opinion on page 511, says:

" * * * . In that year, the company then being in full operation, with a capital of three hundred thousand dollars, the amount authorized by its charter, the board of directors of the company resolved that any stockholder indebted to the company on stock notes might have the privilege of paying any part or all of such indebtedness in the capital stock of the company, at a rate specified in the resolution. Under this authority, stock was surrendered or transferred to the company in payment of notes to the amount of one hundred and thirty-three thousand dollars. There seems to be no ground for questioning the validity of this transaction. I am not aware of any common law principle that forbids it, nor it it shown to have been in contravention of any provision of the company, or any other of the statutes of Ohio. In the case of *Taylor* v. *Miami Exporting Company,* 6 Ohio, it was held that a bank might receive its own stock in payment of a debt," etc.

The same may be said of this case as was said of the 3 Blatchford case, with the addition that, as I view the 6 Ohio case, as hereinbefore indicated, the two cases citing it extended it further than the opinion of the court rendering it warrants. In my judgment, this case did not decide that a corporation can buy its own stock, but the most that can be claimed for that is, that under some circumstances a corporation may acquire shares of its own stock.

...Before taking up the cases that bear on the other side of the question, it is well to have in mind that there is no statute in Ohio that forbids a corporation from acquiring shares of its own stock, and that such an act can not be said to be immoral in the sense that it would be *malum in se* or *malum prohibitum.*

The earliest case in which I find the question discussed is *State of Ohio* v. *The Franklin Bank of Columbus,* decided in 1840, and reported in 10 Ohio, page 91. In the course of the opinion the court says, on page 98:

"Money paid in upon a bank share, or in other words, upon a share of bank stock, becomes corporate property, and may be disposed of in payment of the debts of the corporation, or in any other legitimate way. So lands or any other property received in payment of debts become corporate property, and if sold at an enhanced price, there is so much addition to the profits of the business. So bank shares may, by an individual stockholder, be transferred to the bank in payment of a debt, and when so transferred become the property of the corporation, and it is believed that this is the only legitimate way in which a banking corporation can, as a corporation, become interested in its own stock. And even the propriety of this mode of acquiring property in stock has been seriously questioned."

This case decides, as did the three cases last above herein referred to, that under at least one set of circumstances a corporation can acquire its own stock.

It will be noticed that the court, after deciding the point before it, expresses opinions on two points not necessarily before it in this language: "And it is believed that this is the only legitimate way in which a banking corporation can, as a corporation, become interested in its own stock. And even the propriety of this mode of acquiring property in stock has been seriously questioned." It does not cite any authority, text book or decision, or give any reason for such opinions. They must be treated as gratuitous, and not decisive of any question before the court.

The next decision I find was made in 1878, and was by the District Court of Hamilton County, and was reported in 3 O. L. B., at page 435, in the case of *Hubbard* v. *Riley.* The decision is as follows:

''Judge Cox announced the opinion, and after reviewing the testimony said it was the opinion of the court that C. M. Hubbard was a stockholder, and was subject to the liabilities of a stockholder. There was an absolute agreement on his part to purchase the shares of stock at $1,000 a share each, and an agreement on the part of the company to repurchase the stock from him if he was not satisfied. He gave to Albin, Son & Company, in payment of his stock, $5,000, and his notes for $5,000 endorsed, and on the organization of the company was elected secretary. At the end of the year the company bought back the stock and gave him their notes for $5,000, and these were transferred, after the company became insolvent, to his father, for the purpose of repaying the loan of $5,000 he obtained from him. The law is well settled that an incorporated company, unless the power is given in its charter, can not purchase or deal in the stock of its corporation.''

The judge, in deciding the question, does not cite any authority or give any reason for his statement that ''the law is well settled that an incorporated company, unless power is given it in its charter, can not purchase or deal in the stock of its corporation.''

The next case in point of time is *Coppin* v. *Greenlees & Ransom Co.*, decided in 1882, in the Supreme Court, and reported in 38 O. S., 275. The syllabus of that case is as follows:

''An executory agreement between a manufacturing corporation of this state and one of its stockholders, for the purchase of the stock of such corporation, by the former from the latter, can not be enforced either by action for specific performance or for damages.''

The court in its opinion says:

''Whether the defendant corporation was bound by its executory agreement with the plaintiff to purchase shares of its own stock, under the circumstances detailed in the petition, was, undoubtedly, the question upon which the case turned in the district court.

''The power of a trading corporation to traffic in its own stock, where no authority to do so is conferred upon it by the terms of its character, has been a subject of much discussion in the courts; and the conclusions reached by different courts have been conflicting. Of course, cases, wherein the power is found to exist by express or implied grant in the charter, furnish no aid in the

solution of the question before us; unless the claim of the plaintiff can be sustained that such power was conferred on the defendant by Section 63 of the corporation act of 1852, as amended, which confers on manufacturing corporations the powers enumerated in Section 3 of the act, and, among others, the power 'to acquire and convey, at pleasure, all such real and personal estate as may be necessary or convenient to carry into effect the objects of the corporation.' We think, however, that this claim can not be maintained. The sole object of the defendant organization was 'for manufacturing purposes'; and it can not be said, in any just sense, that the power to acquire or convey its own stock was either necessary or convenient 'for manufacturing purposes.'

"The doctrine that corporations, when not prohibited by their charters, may buy and sell their own stock, is supported by a line of authorities; and, prominent among them, may be mentioned the cases of *Dupee* v. *Boston Water Power Company,* 114 *Mass.,* 37, and *C., P. & S. R. R. Co.* v. *Marsailles,* 84 Ill., 145. But nevertheless, we think the decided weight of authority, both in England and in the United States, is against the existence of the power, unless conferred by express grant or clear implication. The foundation principle, upon which these latter cases rest, is that a corporation possesses no powers except such as are conferred upon it by its charter, either by express grant or necessary implication; and this principle has been frequently declared by the Supreme Court of this state; and by no court more emphatically than by this court. It is true, however, that in most jurisdictions, where the right of a corporation to traffic in its own stock has been denied, an exception to the rule has been admitted to exist, whereby a corporation has been allowed to take its own stock in satisfaction of a debt due to it. This exception is supposed to rest on the necessity which arises in order to avoid loss; and was recognized in this state as early as *Taylor* v. *Miami Exporting Company,* 6 O., 176, and has been incidentally referred to as an existing right since the adoption of our present Constitution. *State* v. *Building Association,* 35 O. S., 258.

"But, however that may be, the right of a corporation to traffic in its own stock, *at pleasure,* appears to us to be inconsistent with the principle of the provisions of ·the present Constitution, Article XIII, Section 3, which reads as follows: (Hereinbefore quoted.) Now it is plain that a business or trading corporation can not exist without stock and stockholders, as it is that the creditors of such corporations are entitled to the security named in the Constitution. *State, ex rel Attorney-General,* v. *Sherman,* 22 O. S., 411. A corporation itself can not be a stockholder of its own stock within the meaning of this pro-

vision of the Constitution. Nobody will deny this proposition, And if a corporation can buy one share of its stock *at pleasure,* why may it not buy every share? If the right of a corporation to purchase its own stock *at pleasure,* exists and is unlimited, where is the provision intended for the benefit of creditors? This is not the security to which the Constitution invites the creditors of corporations. I am aware, that the amount of stock required to be issued is not fixed by the Constitution or by statute, and also that provision is made by statute for the reduction of the capital stock of corporations; but of these matters, creditors are bound to take notice. They have a right, however, to assume that stock once issued, and not called back in the manner provided by law, remains outstanding in the hands of stockholdtrs, liable to respond to creditors to the extent of the individual liability prescribed. In this view it matters not whether the stock purchased by the corporation that issued it, becomes extinct, or is held subject to be reissued. It is enough to know that the corporation, as purchaser of its own stock, does not afford to creditors the security intended. And surely, if the law forbids the organization of a corporation without stock, because the required security is not furnished, it can not be, that having brought the corporation into existence, it invests it with power to assume, *at pleasure,* the identical character or relation to the public that was an insurmountable objection to the giving of corporate existence in the first place.

"If it were averred that the plaintiff had purchased this stock from the defendant company, or from others, under an agreement with the company that it would buy the same from him when he quit its employment, or if *the contract of purchase by the defendant had been executed, very different questions would arise.*"

This clearly decides that a corporation can not buy or traffic in its own stock *at pleasure.* In the Coppin case plaintiff endeavored to enforce an executory contract. If the contract had been executed, the court in that case says, "very different questions would arise."

The next case in point of time is *Shaw* v. *The Ohio Edison Installation Co.,* decided in 1888 by the Superior Court of Cincinnati, and reported in 19 Ohio Law Bulletin, page 292. The court, in its opinion in that case, says:

"The principal contention of defendants is, that the agreement to surrender the stock and accept in lieu thereof a right to one-fifth of the earnings of the company, was illegal and void,

because a corporation can not traffic in its own stock, and because the plaintiff was himself a director of the company when the agreement was made.

"The former objection appears to be well taken. It is a settled law in Ohio that a corporation can not buy its own stock, or become a holder thereof for any purpose except as security for a pre-existing liability. *Coppin* v. *Greenlees*, 38 O. S., 275; *Taylor* v. *Miami Exporting Co.*, 6 O., 176; *Hubbard* v. *Riley*, 3 W. L. B., 434."

This, it will be observed, was also an effort to enforce an executory contract.

The next case in point of time is *The Merchants Nat'l Bank* v. *Overman Carriage Company*, decided in 1898, and reported in the 17 C. C., page 253. The syllabus of that case reads as follows:

"1. A resolution by a corporation authorizing the purchase of a part of its own stock by B, as trustee for the company, to be paid for with notes of the company, is a purchase of the stock for the company.

"2. Such a purchase by a corporation from two of its officers 'in consideration of their proposed retirement,' does not come within the exception to the general principle of law that a company can not deal in its own stock; the purchase was invalid, and those who attempted to sell did not cease to be stockholders."

The court in its opinion says, on page 255:

"That a company can not deal in its own stock is a well settled principle of the law that needs no citation of authorities. There are exceptions to this rule in cases only where the company may buy in its stock for the purpose of saving it from loss, and for its own protection."

From the foregoing it may be said that, as a general principle of law in Ohio, a corporation can not deal in or buy its own stock *at pleasure;* that if the contract concerning such a sale is executory, it can not be enforced by either party to it; if executed on both sides, the Supreme Court, in the Coppin case, *supra,* leaves the question somewhat in doubt. Note the language of the court in its opinion: "If the contract had been executed, very different questions would arise." I can imagine some of these questions would be,

(*a*)   The rights of the parties, as between themselves, if no rights of creditors or others had intervened;

(*b*)   The rights and liabilities of such selling stockholder in relation to rights of intervening creditors.

The cases above referred to also seem to decide that the principle, that a corporation can not buy its own stock, is not an iron clad one, but is modified to the extent, at least, that a corporation can buy its stock to pay a debt due it from a stockholder.   This exception, of course, must be on the principle that a corporation can acquire its own stock when done to avoid loss.

Let us now consider whether a corporation can acquire its stock under circumstances other than that for the payment of a debt due to it.

In 1879 the Supreme Court decided the case of *State, ex rel,* v. *The Oberlin Building & Loan Association,* reported in 35 O. S., 258.   That case recognizes the power in a corporation to receive and cancel shares of its stock in compromise of an indebtedness to the corporation, or other similar purpose.   In its opinion the court says, on page 263:

"We do not deny a corporation has power to receive shares of its stock as security for a debt or other similar purpose."

And also on page 263:

"The association compromised with several of its members, and released them from further obligation to the corporation, as well on account of indebtedness for loans, as on subscriptions. We have examined the evidence, and we do not find there was any want of good faith in these transactions.   The interest of the stockholders, as well as the public, seems to have been kept in view.   Of course, without this such acts could not be upheld; but we are not able to find in the statute any inhibition of the power to make such compromise, and, on the fullest consideration, we unite in holding that the power exists."

The next case I find in point of time was decided by the Supreme Court in 1888, the case being *Morgan* v. *Lewis,* reported 46 O. S., page 1.   The second paragraph of the syllabus reads as follows:

"Upon the trial of the action, one of the defendants, an alleged stockholder, offered to prove that he originally became a

stockholder by receiving from the corporation its stock in ex-
change for his interest in a furnace of which he was principal
owner; that thereafter, the furnace not proving as successful
and profitable as had been expected, some of the stockholders
were dissatisfied with the purchase, and contentions arose among
them; that defendant was blamed by many of them for having
induced the company to make the purchase, and was requested
to take the furnace back, and transfer to the company the stock
he had received for it; that to settle such contention and dis-
satisfaction, he complied with this request, and transferred his
stock to the company, and accepted therefor a deed for the fur-
nace. *Held*: The evidence was admissible.''

I will quote freely from the opinion of the court, beginning
on page 5, as it discusses the question at more length than any
previous cases, and construes several of the former decisions, as
well as the principle that should govern:

''The theory upon which the referee and the court of com-
mon pleas must have proceeded was, that the entire transac-
tion by which Morgan acquired the furnace, and the company
acquired his stock, was void; that it was beyond the power of
the company to engage in the transaction, and that consequently
the company acquired no title to the stock, and Morgan acquired
none to the furnace property. If this conclusion is sound, the
inevitable consequence is, that the company still owns the fur-
nace, and it is assets in the hands of the assignee for the pay-
ment of the company's debts. It is an absurdity to assume that
Morgan is still the owner of both the furnace and the stock. If
he is still liable to creditors as a holder of this stock, the com-
pany, by the same reasoning, is owner of the furnace. It is con-
ceded that the proceeding to subject the liability of stockholders
to the satisfaction of the claims of creditors, has throughout
ignored this property. It does not appear but that this prop-
erty alone would satisfy creditors, nor to what extent it would
exonerate stockholders from the liability which it is now sought
to subject to the satisfaction of creditors' claims. If we were
in accord with the referee and the court of common pleas upon
the main proposition of the case, still it would be our duty to
send the case back for proceedings to subject this property of
the company to the satisfaction, *pro tanto,* of its debts.''

I desire to call attention to the following paragraphs from the
opinion in said case:

''We are of opinion, however, that the referee erred in ex-
cluding the evidence which Morgan offered, to throw light upon

the transaction by which he assumed to acquire the furnace, and transfer his stock to the company.

"The contention of Morgan, in this respect, is not answered by the proposition that the only purpose of offering the rejected proof was to show that the transaction was in good faith, and that this already sufficiently appeared. We have no disposition to call in question the general and well-recognized principle that a corporation can not buy its own stock. It is conceded that this principle proceeds upon *a want of power,* rather than upon any express prohibition in its charter. With this general principle conceded, however, the right of a corporation to take its own stock in satisfaction of a debt due to it, has long been recognized in this state.

"This has been recognized as an exception supposed to rest upon the necessity of avoiding loss. *Coppin* v. *Greenless,* 38 O. S., 279. It is, nevertheless, a relaxation of the general rule. It is, of course, because of the necessity of avoiding loss, and not because it is for the satisfaction of a debt, that the exception is recognized. If the same or a like necessity of avoiding loss should arise in any of the transactions of the company, it could not, with any show of reason, be contended that the application of this principle of necessity should be limited by any iron rule to the case of taking stock for an otherwise hopeless debt.

"The evidence which Morgan offered, and the referee rejected, tended to establish, in substance, that Morgan had traded to the company this furnace property for stock. That the furnace promised to prove a failure, or, at best, a disappointing and unsatisfactory venture. Contentions arose over the transaction, between Morgan and some of the stockholders. Many of them blamed him for having induced the company to make the purchase. Thereupon they—'many of the stockholders'—simply proposed a rescission of the contract of purchase; that Morgan take back the furnace and restore to the company the stock he had received for it. The company was out of debt. Nobody could possibly be hurt by a rescission of this contract, which had caused so much discontent and contention, and which promised to be a losing venture for the company, and Morgan's fellow stockholders. This proof would have established something beyond the mere good faith of the transaction. It would have tended to establish the fact that Morgan yielded to the importunities of many stockholders to rescind a bargain, and set at rest an unfortunate controversy which was rapidly breeding discord among the stockholders.

"The finding of the referee, that this transaction itself worked a reduction of the capital stock of the company, is not tenable. There was nothing in the way of the company reissuing this stock, or its equivalent, to others who may have desired it. There was

nothing in the fact that these certificates were marked 'canceled' on the face, by the secretary of the company, and by him treated as surrendered stock, to authorize the finding that the capital stock of the company was reduced.   This was no part of the transaction with Morgan, and there was nothing in the fact of the re-exchange of stock for the furnace which called upon the officers of the company to treat the stock as canceled or the capital *pro tanto* reduced.   This conclusion is not, in principle, qualified by the fact that the stock was not in fact thereafter represented.   *Then, we should not lose sight of the fact that there was an executed transaction.*   The exchange—or the re-exchange, rather—had been made, possession of the furnace taken by Morgan, and retained by him for years before the transaction was questioned by any one.·   *To this day it has remained free from direct attack.*   Certainly, the possession by Morgan of this property, which had theretofore been in the possession of the company, was a circumstance proper to be considered with other facts in the case.   It at least helps us to distinguish it from the case of *Coppin* v. *Greenlees,* 38 O. S., 275, relied upon by defendants in error.   In that case it was held that:

"'An executory agreement between a manufacturing corporation of this state and one of its stockholders, for the purchase of the stock of such corporation by the former from the latter, can not be enforced, either by action for specific performance or for damages.'

"That this presents a very different case from the one of an executed contract is emphasized by the following language of Judge McIlvaine, by whom the opinion was prepared:

·  "'If it were averred that the plaintiff had purchased this stock from the defendant, or from others, under an agreement with the company that it buy the same from him when he quit his employment, or *if the contract of purchase by the defendant had been executed, very different questions would arise.*'

"In *State* v. *Building Association,* 35 O. S., 263, the general principle that a corporation may not traffic in its own stock is recognized.   Yet in the same connection it is said:  'We do not deny that a corporation has power to receive shares of its stock as security for a debt *or other similar purposes.*'

"It is apparent from the foregoing that no inflexible rule has been recognized by this court, that a corporation may not in any case, nor· for any purpose, receive its own stock.   *On the contrary, the way is left open for the application of exceptions to the general rule in proper cases.*   It is one of the established facts in the case that all the debts which are sought to be satisfied by this proceeding were contracted subsequently to the transaction which is assailed.   The·transfer of the furnace prop-

erty from the possession of the company to that of Morgan was a fact to which persons giving credit to the company could not safely close their eyes. The inquiry which it would naturally excite would have led to the information that the trade by which the company secured the furnace, and Morgan the stock, had simply been rescinded, and the property—stock and furnace—re-exchanged.

"It being the law of our state that there are exceptions to the general rule, that corporations may not deal in their own stock, all persons dealing with this company must be held to have done so in the light of this phase of the law. All persons are as much presumed to know of exceptions to a principle as of the principle itself. The slightest inquiry would have revealed the fact, that as between himself and the company, Morgan did not sustain the relation of stockholder at the time these debts were contracted."

The agreed statement of facts shows that prior to April 10th, 1901, the defendant company was engaged in the manufacture and sale of the "Mattie Mitchell Self-Rising Flour," a new and untried variety of food product for which there was little or no market or demand; that on April 5, 1901, the company increased its capital stock from $30,000 to $50,000, and by its board of directors, empowered, authorized and directed its president and secretary to issue and sell two hundred shares of the increased capital stock, for the purpose of "advertising and creating a demand for said food product"; that the president and secretary, acting under the authority, power and direction of the company, on April 11, 1901, sold to said George A. Stanley thirty of said shares, and issued a certificate therefor to him; and for the purpose of inducing said Stanley to purchase said stock, the president and secretary represented to said Stanley that said company *could and would obtain the entire amount of money* required for the above purpose from the sale of its unissued stock; and further said president and secretary represented that inasmuch as said business was largely experimental in character, said company would conduct its business entirely within its *paid-in* capital, and that it would not enlarge or increase its expenditure beyond its said capital, and that in no event would said company obtain credit or borrow money for the purpose of carrying on its business, or for advertising or creating a demand for its said product; and that said Stanley,

in purchasing said stock, relied upon said representations and promises, and would not have purchased the same had said representations and promises not been made to him.

This proof means that the company was incorporated to manufacture and sell a new and untried variety of food product, for which there was little or no demand or market; and that, prior to April 10, 1901, the funds of the company had been largely used in advertising and attempting to create a demand for said food product; and that the board of directors, on April 5th, 1901, needing more money for said purposes, increased its capital stock from $30,000 to $50,000, and authorized, directed and empowered the president and secretary to sell two hundred shares of stock to raise money for advertising and creating a demand for said food product; and that the president and secretary, in carrying out said power, authority and direction, represented and promised to Stanley, as aforesaid. These representations and promises mean that the company had determined that it could and would obtain all the money it needed for these purposes from the sale of its unissued capital stock; and that it had been determined, as the policy of the company and business, that it would and could conduct its business within its paid-in capital; and that, with the addition of the money obtained from the sale of said stock it would have passed the experimental stage, and would not need any more money for the purposes aforesaid; and that in no event would it borrow money for carrying on its business, or for advertising or creating a demand for its said product. In other words, these representations mean, that the company, with the money realized from the sale of said stock, would have passed the experimental stage, and would be in such condition that it would have created a demand for its food product sufficient in volume to warrant its continuing in business; or, if such was not the situation, it would not borrow money to carry on its business, or advertise or further attempt to create a demand; that the company would then be a success, or future failure was so sure that it would be inadvisable to further attempt to carry it on; and that stockholders would not be made liable by any loss other than what had been incurred in the purchase price of the stock; and that these promises and representations were relied upon by said

Stanley, and induced him to buy said stock; and had they not been made, he would not have made such purchase.

The agreed statement of facts further shows that afterwards, and before August 29, 1901, said company had expended a large sum of money in advertising, and had exhausted its means for further conducting its business; and then, by its officers and directors, determined to borrow a large sum of money to be further used in advertising such food product, which was in violation of the representations and promises aforesaid. In other words, the company determined it would use money for advertising, and would subject stockholders to a further liability. Said George A. Stanley was unwilling to be thus subjected, and insisted that the representations and promises made to him be observed; and, in furtherance of the protection of what he conceived to be his rights, objected and protested to the stockholders and directors of said company, and to the bank from whom it purposed to borrow money. This caused the directors to believe that if Stanley carried out his purpose, a situation would be created whereby the company would be involved in ruinous litigation, and embarrassed in borrowing money. and perhaps prevented from borrowing money, or which might work a dissolution of the company, from any or all of which great loss would follow to the company and its other stockholders.

With this situation confronting the company and its directors and other stockholders, on August 29, 1901, in the language of the agreed statement of facts, ''thereupon, and for the purpose of avoiding loss to the company and adjusting said controversy whereby it might be able to continue its business, said company, by its officers and directors, then and there agreed to receive back its said shares of stock and return to said defendants George A. Stanley and Jessie McMath Stanley the amounts of money they had paid therefor, without use or diminution thereof, and regardless of the result of the business while said stock had been held by those defendants; and pursuant to said agreement, on the 29th day of August, 1901, said George A. Stanley, in good faith, released and surrendered said thirty shares of stock to the company by a writing on the back of the certificate representing said stock, properly signed and witnessed, and delivered the same to the secretary of the company, and requested that said

release and surrender be properly entered on the books of the company.''

This action was afterwards ratified and approved by all the directors and all the stockholders of the company.

In the case at bar, as in the Morgan case, *supra,* the good faith of all the parties was not questioned.

The thing done was done to avoid loss to the company.

It was an executed transaction.

The company at the time was not in debt.

It has always remained free from direct attack.

It was not questioned by any one for several years after it occurred.

Again, the company, in acquiring said stock, was not attempting to deal in its own stock *at pleasure.*

I think the facts of this case bring it within the reason, spirit and principle of the opinion of the court in the Morgan case, which opinion, among other things, says:

''It is apparent from the foregoing that no inflexible rule has been recognized by this court, that a corporation may not in any case, nor for any purpose, receive its own stock. On the contrary, the way is left open for the application of exceptions to the general rule in proper cases.''

The court is of the opinion that this decision is in harmony with an utterance of our Supreme Court in 44 O. S., 285, in these words:

''The principles of an underlying system of jurisdiction should be made to vary with circumstances, and to be so applied as to meet the difficulties and conditions of a people. It is with this qualification that, as has been frequently observed by the courts, the common law has been adopted in this state.''

It follows, and I hold, that George S. Stanley was not a stockholder, and the referee erred in holding him to be such. A decree may be prepared accordingly.